## BENNETT et al. v. BOWEN et al.

### No. 4263.   Decided June 20, 1925.   (238 P. 240.)

1. ACTION—ORDINARILY ACTION FOR MONEY ONLY ON CONTRACT ONE OF LAW.  Ordinarily an action for money only on a contract, express or implied, is an action at law.

2. APPEAL AND ERROR—SUIT FOR CONTRIBUTION TREATED AS EQUITABLE PROCEEDING BY SUPREME COURT, WHERE TRIED WITHOUT JURY AND WITHIN JURISDICTION OF COURT OF EQUITY.  Parties having tried action for contribution to court without a jury, and defense relied on being matter of which court of equity had cognizance and jurisdiction, Supreme Court, for purpose of determining effect to be given to evidence, will consider it as an equitable proceeding.

3. CONTRACTS—EVIDENCE HELD TO SHOW THAT DEFENDANTS SIGNED CHAUTAUQUA CONTRACT UNDER MISTAKE OF FACT, INDUCED BY REPRESENTATIONS.  Clear preponderance of evidence *held* to show that defendants signed Chautauqua contract, binding them to purchase stated number of season tickets, under mistake of fact, induced by conduct and representations of one of plaintiffs.

4. CONTRACTS—FAILURE OF PARTY TO READ CONTRACT NO DEFENSE, WHERE SIGNATURE OBTAINED BY FRAUD AND MISREPRESENTATION.  That defendants, who signed Chautauqua contract, were negligent in not reading it, is no defense, where they signed under mistake of fact, induced by misrepresentations.

5. CONTRACTS—RULE THAT NONDISCLOSURE NOT FRAUD INAPPLICABLE, WHERE ACTIVE CONCEALMENT OF FACTS.  Rule that nondisclosure of facts does not constitute fraud does not apply, where there is an active concealment of facts.

GIDEON, C. J., and CHERRY, J., dissenting.

Appeal from District Court, First District, Cache County; *M. C. Harris,* Judge.

Action by George D. Bennett and others against Edith Bowen and others.  Judgment for plaintiffs, and defendants appeal.

Headnote 1.   1 C. J. p. 1045.
Headnote 2.   3 C. J. pp. 723, 724.
Headnote 3.   13 C. J. p. 779.
Headnote 4.   13 C. J. p. 371.
Headnote 5.   13 C. J. p. 383.

REVERSED and REMANDED, with directions.

*Fonnesbeck & Nelson,* of Logan, for appellants.

*Jesse P. Rich,* of Logan, for respondents.

THURMAN, J.

The first and second paragraphs of appellants' brief filed in this court contain a comprehensive statement of the issues tried in the court below. The paragraphs referred to read as follows:

"This is an action by plaintiffs against defendants for contribution on a certain alleged guaranty contract, Exhibit A, signed by plaintiffs and defendants as second parties, and Ellison-White Chautauqua Association as first party. By the terms of said contract the second parties agreed to buy and pay for 725 season tickets at $2.75 each for Chautauqua to be held in Logan in the summer of 1923. It is alleged in the complaint that plaintiffs and defendants, as second parties to said agreement, failed to purchase or sell the 725 season tickets as provided in said agreement, that Ellison-White Chautauqua Association performed their part of the said agreement, that there was a large deficit due the said Ellison-White Association, and that a committee, the plaintiff herein, chosen from the signers, met with a representative of said Ellison-White Association and settled the deficit by agreeing to pay one-half, which it is alleged amounted to $16.50 for each signer to pay; that all of the signers paid their respective shares, except 10 of them, including the answering defendants herein, who refused to pay the said sum of $16.50 each, or any part thereof; that two or three of the signers are insolvent, and that, in order to take advantage of the compromise settlement, the plaintiffs borrowed the sum of $183.65 from the bank on their note, Exhibit B, and plaintiffs demand judgment against these answering defendants for their proportionate share of the $183.65.

"The answering defendants deny that they signed any contract or agreement, deny that they entered into any agreement with Ellison-White Chautauqua Association, allege that they had no information that it was a contract they were signing, nor that any contract was attached thereto, but that plaintiffs herein particularly plaintiff W. G. Ruckenbrod, requested these defendants to sign their names to a piece of blank paper, and represented that it was for the purpose of evidencing their interest in and good will towards the Ellison-White Chautauqua Association, and a desire that said association should return to Logan for the season of 1923; that said representations were false and fraudulent, and were made by Ruck-

enbrod and others to induce and inveigle these answering defendants into signing said alleged guaranty; that these defendants believed the said representations so made to be true, and relying thereon, signed their names to said paper so presented; that at the time they signed the paper it was so folded and presented to them for their respective signatures that the printed matter embodying the terms of the proposed agreement was entirely concealed and hidden from view; that these defendants had no knowledge or information that any contract was attached; that they did not intend to enter into any contractual obligation whatsoever; that the alleged contract was signed by mistake on the part of these answering defendants, without any neglect on their part; that they supposed that they were signing said paper for an entirely different purpose, due to the misrepresentations as hereinabove stated."

The case was tried to the court without a jury. Findings were made in favor of the plaintiffs and against the defendants L. P. Peterson, Leo Hansen, Jacob Gessel, E. T. Hawkins, and Joseph Zundel. Judgment was entered against each of them for the sum of $17.50, with interest thereon and costs. From the judgment so entered defendants appeal.

The assignments of error challenge the findings of the court on the grounds that they are not supported by the evidence. The findings most vigorously assailed are to the effect that the affirmative allegations in defendants' answer respecting fraud and misrepresentations are untrue, and that defendants did not rely thereon. It is admitted by defendants in their answer that the Chautauqua Association performed their part of the contract and that the second parties to the contract failed and neglected to sell the 725 season tickets mentioned therein. They deny, however, that appellants were parties to the contract at all, notwithstanding they signed the paper upon which the contract was printed. There is some conflict in the evidence as to what was said and done when the signatures of defendants were obtained. The defendants against whom judgment was rendered each testified in his own behalf.

The defendant Zundel's testimony was to the effect that as he and his wife entered the tent to the Chautauqua the last or next to the last night of the session of 1922 Dr. Ruckenbrod (plaintiff) asked how he liked the Chautauqua.

Witness said he had been to only one and had enjoyed it. Ruckenbrod then asked how he would like to have it return next year. Witness replied it made no difference to him. Ruckenbrod said, if they could get 20 or 30 citizens to express their desire to have it return, it would come back. He asked witness to sign. He declined, on account of his position in the post office. He had known previously that some citizens had sold tickets. Witness was prohibited on account of the postal laws. Ruckenbrod said: "That is all right; give us your moral support." Witness said he would be glad to do that. Nothing was said about a contract. Ruckenbrod then handed him a piece of paper, with no printing or writing upon it, except two or three names, and showed him where to sign. He signed, and he and his wife went in. He never knew of a contract until shortly before the return of Chautauqua in 1923, and never saw it until the time of the trial.

L. P. Peterson, defendant, testified that in 1922 he attended a session of Chautauqua, and as the crowd was coming out of the tent Taft Benson and Ruckenbrod were there. They asked witness how he liked the Chautauqua. Witness said, "All right," and "went to pass on." They said, "Hold on; do you want this Chautauqua to come again?" Witness said "Yes; the same as you do." He says, "We want you to sign this document." There was no printing on it, just two or three names. He said, "Come and sign this, and give us your moral support anyway." He did not mention a contract. Witness knew nothing of a contract. Ruckenbrod only wanted it signed to get moral support to have the Chautauqua come back. That is all that was mentioned. The alleyway was filled up, everybody wanting to get away. Witness signed and went out.

Jacob Gessel, defendant, testified he attended a session of Chautauqua. He thought it was the last evening in 1922. He was quite intimate with Dr. Ruckenbrod. They greeted one another, and Ruckenbrod said, "Well, Jake, how did you enjoy the performance to-night?" Witness answered, "Well, I enjoyed it fine; I thought it was real nice." Ruckenbrod asked, "How would you like to have it come back

next year?'' Witness answered, ''I think it would be very nice to have it come back.'' Ruckenbrod said, ''You had better sign your name here to show that you want it to come back next year.'' He handed witness a pen, and witness signed his name and walked out. There was a crowd, some in front and some behind, going out. They were right in the hall. The paper was folded. It was dark. He thought the paper was white. Ruckenbrod said nothing about signing a contract, or any obligation or duty to sell tickets. He had no idea of any such duty. ''He wanted'' witness' ''signature as an appreciation and desire to have it come back.'' He afterwards told them, if the rest paid, he would not stand out, but that he was not bound by any contract. He never saw the contract until the trial. He thought he would be giving them moral support if he patronized them next year. Witness just considered he was giving them moral support. Witness said he was caught unawares, and never thought anything of this kind.

E. T. Hawkins, defendant, testified that he signed because of a talk given by a Chautauqua man on the platform the evening he attended the meeting. The man told how they had enjoyed coming to Logan, and how fine the people of Logan had been in coming out to their performances. He never mentioned contract. At the close of his speech he said, ''Those who want us to come back next year put your names on the sheet of paper as you go out.'' Witness asked his wife if they wanted it to come back. She said, ''Yes; I enjoyed it.'' Witness signed his name and went out. That was the first time witness ever attended Chautauqua. No mention was made of a contract. The man merely said, ''Put your names on the paper as you go out.'' Witness was sure he would never have signed, if he had known it was a contract. The people were crowding around. He thought they were getting a list of names, showing that the people of Logan were enjoying the performance. He put his name down to show his pleasure, not thinking it was a contract.

Leo Hansen, defendant, testified that he attended Chau-

tauqua once during 1922, at an evening performance. As he was going out there was a crowd going out of the tent. Dr. Ruckenbrod and another were there. Ruckenbrod asked if he liked, the Chautauqua. Witness told him he did. Ruckenbrod said they needed the sentiment of the people to show the Chautauqua people that Logan would like to have it come back again the next year; that they would like to have enough people in town showing on paper that Logan wanted the Chautauqua to come back again, and asked if witness liked the Chautauqua. Witness said he did. Ruckenbrod said a number of people had put their names on a sheet of paper, and wanted witness to put his name there too. ''It was kind of dark there at that time.'' Witness signed. He noticed some names above his. The paper was folded and wrinkled. He said he took Ruckenbrod's word on it, and didn't see any contract. Ruckenbrod did not mention contract, nor make any explanation about selling tickets. Witness' wife was with him. They were in a hurry. He thought all they wanted was the sentiment of the people to show they wanted the Chautauqua to come back. He did not notice any printed contract, never saw it before the trial, and would not have signed it, if he had known it was a contract. He did not remember ever attending Chautauqua before, except one in Salt Lake.

It appears from defendants' testimony that none of them, except Hawkins, ever heard any announcement from the platform. It appears they knew nothing about how the Chautauqua was financed, or that it was usual or customary for people to obligate themselves by contract to get the Chautauqua to return. There was a meeting held after the Chautauqua of 1923 to adjust the deficit that had occurred. Two of the defendants attended the meeting and according to their testimony they protested against the proceeding, and denied having entered into the contract. The other three defendants did not attend the meeting at all. There is nothing in the record to show that any of the defendants consented to the settlement made with the Chautauqua management.

Several witnesses for plaintiffs testified in rebuttal. Dr. W. G. Ruckenbrod, who appeared to be most prominent in the matter of making representations, testified in substance as follows: He signed the contract in question, and helped to get other signers. At practically all the meetings of Chautauqua after the second day, the director of the association announced from the platform that there was a Chautauqua contract for the coming year; that the contract would have to be signed by the citizens in order to secure it for the following year; that they would have to have a guaranty before they would come back. Witness did not remember of the contract being doubled up when any one signed it. The contract was lying on a table. At night there was electric light where the contract was signed. Witness could read it very distinctly, never told anybody it was not a contract, nor indicated to anybody that it was merely a blank piece of paper. Witness told those whose signatures he procured they would have to have a contract to get the Chautauqua. He got four or five signers by calling on them personally at other places. He got no signers while they were going in or coming out. He did not know Peterson at that time. Witness was the first to sign the contract. Witness would sometimes tell the people that, in order to have the Chautauqua come back, they would have to sign the contract. He stated he never told any of the defendants that the object of their signing was to give the thing their moral support. He never heard any of the defendants make the claim that they did not know it was a contract before the suit was brought. He asked them to sell their tickets, and told them to see Miss McCausland, the secretary.

Several other witnesses testified to the effect that the Chautauqua director at every meeting, towards the end, announced that, in order to get the Chautauqua back, it would be necessary to have the contract signed; that he made it clear that they were required to guaranty a certain amount. The witnesses, however, could not say whether the defendants were present when such announcements were made. There is considerable evidence in the record relating to matters of

little or no materiality. The foregoing is substantially all that has a bearing upon the question of fraud, mistake, or misrepresentation.

The validity of the contract between the Chautauqua Association and the parties of the second part thereto is not in dispute, nor is there any controversy as to the fact that the Chautauqua Association performed its part of the contract and that there was a deficit during the Chautauqua season for 1923, for which the parties of the second part became legally liable. Furthermore it is conceded that plaintiffs made a compromise settlement with the Chautauqua Association, and fully paid to said association the amount agreed upon in said compromise settlement.

The contention of defendants is that they were not parties to the contract; that they incurred no liability; that they did not participate in the compromise settlement, or in any manner assent thereto. All of the appellants except Hawkins, complain of the conduct of the plaintiff Ruckenbrod at the time the contract was signed, and defend upon the alleged grounds of his misleading representations which induced them to sign. The finding of the court upon that point, which is challenged by appellants, reads as follows:

"That the plaintiff W. G. Ruckenbrod did not represent to these defendants that their signatures were desired merely for the purpose of evidencing their desire as representative citizens of the community of Logan City to have said Chautauqua return to Logan for the season of 1923, and the said plaintiff W. G. Ruckenbrod has made no false representations to the said defendants involved in this action, and that defendants did not rely on any representations made by said plaintiff, and said defendants had or should have had knowledge or information regarding the contract which they were signing."

Appellants contend that the finding is not supported by the evidence.

Before considering the effect of the evidence, it is necessary to determine the nature of the action—whether it is a legal or equitable proceeding. It is admitted by both parties that it is an action for contribution. Ordinarily, an action for money only upon a contract, express or im-

plied, is an action at law, and is so treated and considered. The authorities upon the subject of contribution appear to hold that, while formerly an action for contribution was treated as a proceeding in equity, in modern practice it may be either legal or equitable—that is, the jurisdiction is concurrent. In 6 R. C. L. at page 1059, the author says:

"Contribution was at one time enforced only in a court of equity but it is now settled that an action at law will lie on an implied contract of reimbursement, but not on the original contract by subrogation, and the implied promise relates back to the execution of the contract under which contribution is sought, so that an action at law for contribution may be maintained against the estate of a surety who died before the payment was made for which contribution is claimed, and the plaintiff is not driven to a suit in equity. Assumpsit for money paid by a surety is a modern remedy, and as between cosureties it seems to have been adopted on the ground that, as courts of equity had established an equitable right to contribution, the law should imply a promise by each to contribute to their joint liability their respective parts, whenever the pre-established principles of equity should require contribution. Courts of equity have not, however, been ousted of their jurisdiction in matters of this kind on account of the assumption thereof by the law courts, but their jurisdiction is now considered concurrent."

The parties to this action having tried the case to the court without a jury, and the defense relied on being matter of which a court of equity has cognizance and jurisdiction, for the purpose of determining the effect that should be given to the evidence, we are inclined to hold that it was an equitable proceeding, and in that light the evidence will be considered, and the case decided accordingly.

Without reviewing the evidence at length, we are of opinion that the evidence, considered as a whole, clearly established the fact that the defendants signed the Chautauqua contract under a mistake of fact, which mistake was induced by the conduct and representations of the plaintiff Ruckenbrod, except as to the defendant Hawkins, and, as to him, that his mistake was induced by the Chautauqua man who addressed the people from the platform at the close of the performance. Ruckenbrod disclaimed any knowledge

of having procured the signatures of defendants, or
of having made any representations to them at àll,
while every one of the defendants, except Hawkins, says he
did make such representations. The representations made to
each defendant were strikingly similar. They ran something
like this:

"How did you like the Chautauqua? If you liked it, sign this
paper to show your appreciation and desire to have it come back.
Give it your moral support."

Nothing was said about a contract; no intimation that lia-
bility would be incurred by signing. Such was the char-
acter of representations made. No suggestion of anything
to put the defendants on their guard, or cause them to
suspect that they would incur other than a moral obligation
by signing the paper. The place where they stood was
crowded—people in a hurry to get in or out. The occasion
was certainly auspicious for a misunderstanding.

But it is contended by respondents' counsel, in his argu-
ment, that defendants were negligent in signing the contract,
and quotes from *Greenfield's Estate*, 14 Pa. at page 489,
the following:

"If a party who can read   *   *   *   will not read a deed put
before him for execution, or if, being unable to read, will not de-
mand to have it read or explained to him, he is guilty of supine
negligence, which, I take it, is not the subject of protection, either
in equity or at law."

There may be some foundation for that doctrine, in the
absence of fraud, misrepresentation or concealment; but
where one or more of these occur it is not the law. Approxi-
mately 6,000 years ago, when Cain's hands were reeking with
the blood of his brother Abel, he was asked the question,
"Where is Abel, thy brother?" Cain answered, "I know
not; am I my brother's keeper?" Human nature has not
changed. The idea is still prevalent that our brother must
look out for himself. It will not always do, however,
in the administration of justice. We are our brother's
keeper to the extent that, if, in a business transaction,
we mislead him by false representations or concealment, to
his injury, we are liable for the consequences of our wrong-

ful conduct. In Page on Contracts (2d Ed.) § 233, it is said:

"If the party defrauded could read, has a chance to read, and omits to read the instrument, relying on the adversary party's statement of its contents, the instrument should on principle be treated as void, as between the parties thereto, since it should be no defense for the party who is guilty of the fraud to say that the other party was negligent in believing him. The majority of the courts take this view of such cases, and hold such contract void, in spite of the negligence of the defrauded party."

The statement of the author that the majority of the courts take this view appears to be supported by the cases cited in the note.

But it is further contended by plaintiffs counsel that no one told the defendants that they were not signing a contract, and that none of them testified that he asked what he was signing. Upon this point we quote from 13 C. J. at page 383, § 282:

"The rule that nondisclosure of facts does not constitute fraud does not apply where there is an active concealment of facts. This is a fraud. By an active concealment is meant either a representation good as far as it goes, but accompanied with such a suppression of facts as makes it convey a misleading impression, or an attempt by one party to draw the other's attention from a fact or to cover it from view. In the first case the nondisclosure has the effect of either impliedly representing that the fact concealed does not exist or of rendering the facts disclosed absolutely false. In the second case the conduct of the party, outside of the actual representation, is a fraud on the other."

This doctrine is also well supported by numerous cases in the note. It is unnecessary to incumber the opinion with quotations from the cases referred to. From our examination we are satisfied that the excerpt reflects the great weight of judicial opinion. It appears from the evidence that all the parties involved are prominent, highly respected citizens of Logan.

The respondents must have been actuated by motives founded upon principle, or they would not have instituted an expensive suit for the trifling amount involved, as far as dollars and cents are concerned. The defendants must

have been inspired by the same motives or they would not have incurred the expense of defending the action. Whether or not the representations made were actually intended to deceive and mislead is not of controlling importance. That they did deceive and mislead, and induce the defendants to sign an instrument which they would not have signed, but for the representations, is established by the clear preponderance of the evidence. For that reason the findings should be set aside and the judgment reversed.

In view of the conclusions reached, the remaining errors assigned are rendered immaterial, especially as in our opinion no useful purpose would be accomplished in remanding the case for a new trial.

It is therefore ordered that the judgment be reversed, and the cause remanded, with directions to the court below to enter findings and judgment for the defendants, no cause of action, at plaintiffs' cost.

FRICK and STRAUP, JJ., concur.

GIDEON, C. J. (dissenting). If this case is considered as an action at law, there is, admittedly, substantial competent evidence to support the trial court's findings. Considering the case as one in equity, as this court has, the weight of the evidence, in my judgment, is not so conclusive against the trial court's findings as to warrant overruling such findings.

The written agreement which appellants admittedly executed is an unambiguous contract to buy a definite number of tickets at a stipulated price for a Chautauqua entertainment to be given during the Chautauqua season of 1923. The fact that appellants signed their names to this agreement carries with it the presumption that the parties knew that they obligated themselves to perform the conditions of the written agreement. That presumption is sufficient, in the absence of evidence, to warrant the court in rendering a judgment against them. There was, in addition, the positive testimony of respondents and their witnesses that no

false or misleading statements were made to appellants at the time of the signing of the agreement, or any other time. Apparently the only excuse interposed as a defense is the rather hazy, intangible claim that appellants thought they were only pledging, what they are pleased to designate, their "moral support." Just what duty appellants thought they were assuming by reason of this moral obligation, or what services they understood they were to render, is equally hazy and intangible. Whether appellants considered their moral support should consist in crying from the housetops the approach of the Chautauqua entertainment, or whether they proposed to carry banners up and down the highways, advertising the advantages of a high-class entertainment, or whether it was an agreement on their part to contribute their pro rata share of any deficit that might exist at the close of the week's entertainment, is not yet clear. The trial court, after seeing and hearing the witnesses, concluded it was the latter. In my judgment the trial court was right.

The rule has been repeatedly announced by this court that, while the court has the constitutional right and duty, in equity cases, to review the findings of the trial court it has also declared that findings made upon conflicting evidence will not be set aside, unless it clearly appears that the court has misapplied proven facts, or has made findings clearly against the weight of the evidence. *Olivero* v. *Eleganti,* 61 Utah, 475, 214 P. 313.

The written agreement signed by appellants speaks for itself. It is an unconditional agreement on the part of appellants to do a definite thing. The probability or improbability of the appellants knowing or not knowing its provisions must necessarily, to a large extent, depend upon the surrounding facts, and the probability or improbability of respondents perpetrating a fraud upon appellants, as claimed. The respondents, presumably, are public-spirited citizens, and were engaged in the laudable effort of securing for the people of the community a week of educational entertainment. The record shows they succeeded, and the Chautauqua entertainment was given in 1923 to the people of

the community, based upon the obligation of the appellants herein and others. The improbability of respondents making the alleged false and misleading statements to procure the signatures of appellants, coupled with the other surrounding circumstances in the case, not only fail to furnish any justification for reversing the court's findings, but tend strongly to support the same.

For the reasons indicated, I am of the opinion that the judgment should be affirmed, and therefore dissent.

CHERRY, J., concurs.